**BURLEIGH HOUSE, Inc. v. FINANCIAL FEDERAL SAVINGS AND LOAN ASSOCIATION.**

No. 72-19709.

Circuit Court, Dade County.

September 17, 1973.

174

Lapidus & Hollander, Miami, for the plaintiff.

Sams, Anderson, Alper, Spencer & Post, Miami, and Sam Daniels, Miami, for the defendant.

DAVID GOODHART, Circuit Judge.

*Final judgment:* This cause came on to be heard before me, the undersigned judge of the above entitled court, for non-jury trial. The issues were framed by the amended complaint, more definite statement, and answer to the amended complaint. Plaintiff has alleged usury in connection with an eighteen month, $7,000,000 loan, evidenced by a note payable to the defendant in the amount of $7,800,000. Defendant has denied usury and raised one affirmative defense, that the action is barred by the statute of limitations.

This court heard testimony for two days and listened to extensive oral arguments on the law and on the facts. Having had an opportunity to hear the witnesses, to observe their demeanor while testifying, their frankness, or lack thereof, their intelligence, their interest, if any, in the outcome of the case, and the means or opportunity they had to know about the facts upon which they testified, and having considered all of the evidence in the cause, and carefully weighed it in light of the documentary proof offered by the parties, it is considered, ordered and found as follows —

### Findings of fact and conclusions of law

Defendant is a federally chartered savings and loan association. Plaintiff is the developer of a 360-unit highrise condominium. In 1968, the defendant approached the plaintiff and offered both construction and permanent financing for the project. Initially, Peter Herrig, executive vice presidet of the defendant, assured the plaintiff that the savings and loan would make 360 long term, individual loans. Upon completion of construction and the sale of the units, the long term loans would be assumed by the purchasers. It was upon these representations that the plaintiff broke off negotiations with other financial institutions and set up its sales program. On December 20th, 1968, the defendant requested the plaintiff to sign a formal application letter (plaintiff's exhibit no. 1). The application was for an eighteen month construction loan. By then, facing the pressure of time, and on the repeated assurances of Herrig, defendant's officer, that the details would be worked out in some manner, plaintiff signed the application and paid the defendant a $39,000 fee. On January 6th, 1969, the defendant issued its commitment letter (plaintiff's exhibit no. 2). The commitment was for an eighteen month construction loan of $7,000,000. Disbursal would be made as construction proceeded. Interest would run on the entire loan after thirteen months. For five months, the defendant would receive interest on a substantial portion of the loan funds it still retained. Plaintiff objected to this device. Once more Herrig assured him that the interest would be abated and the construction period extended. Plaintiff signed the commitment

and paid the defendant another $39,000 fee. At this point, defendant had refused to provide a combination construction and permanent loan. It was clearly structuring two separate loans. Between January 6th, 1969 and February 26th, 1969, the date of closing of the construction loan, plaintiff applied for an extension of the construction period (plaintiff's exhibit no. 4). It furnished the defendant with its general contract showing construction was to take sixteen months from the date of commencement (plaintiff's exhibit no. 6). It told the defendant it could not begin construction until April of 1969. It repeatedly urged the defendant that it would need at least eighteen months to build and complete the building. The construction loan agreement prepared by the defendant reflected that the construction of the building was to take eighteen months (plaintiff's exhibit no. 7).

Negotiations leading up to the loan were conducted between Herbert Buchwald, president of the plaintiff, and Peter Herrig, executive vice president of the defendant. Herrig is still employed as executive vice president of the defendant. The defendant did not choose to have him testify before this court. It presented no testimony from any officer directly concerned as to its intentions in so structuring the construction loan as to provide it interest on funds not as yet disbursed. This practice has been condemned as a device or contrivance to exact from a borrower greater interest than the usury laws permit, Coral Gables First National Bank v. Constructors of Florida, Fla. App. 119 So.2d 741, Williamson v. Clark, Fla. App. 120 So.2d 637. In *Williamson,* the court held —

> "Since time as well as amount of principal is a factor in the calculation of interest, it is evident that retention of a substantial portion of the loan without a corresponding abatement of interest on the amount retained has the effect of substantially increasing the per centum of interest on the actual amount advanced by the lenders and received by the borrowers, which is the significant amount contemplated by the statute . . ."

This court finds that at the time of making the loan, the defendant knew it would take eighteen months to construct the building and the thirteen month provision for the running of interest was deliberately inserted as a device for exacting greater interest from the borrower.

The defendant charged as "closing costs" on this loan, $390,000. It is undisputed that its actual reasonable out-of-pocket expenses were $66,812 (plaintiff's exhibit no. 20).

Florida has held that the actual and reasonable expenses of making a loan may be passed on to the borrower but all other fees

are chargeable as interest, Pushee v. Johnson, Fla. 166 So. 847, Ayvas v. Green, Fla. 57 So.2d 30, Mindlin v. Davis, 74 So.2d 789, Williamson v. Clark, Fla. App. 120 So.2d 637. In *Pushee* it was held —

> "It is also well settled in this jurisdiction that the borrower may legitimately agree with the lender to pay the *actual* and *reasonable* expenses of examining and appraising the security offered for the loan, as well as for title insurance, and the costs of closing the transaction . . ."

In *Mindlin* —

> ". . . the borrower may legitimately agree with the lender to pay *actual reasonable* expenses of examining and appraising security offered for a loan as well as the costs of closing the transaction. Examining title of the loan security and handling the closing of a loan are services traditionally rendered by attorneys at law and involve an *actual expense* to the lender which he may pass on to the borrower under the rule quoted . . ."

The defendant charged the plaintiff $390,000 to cover actual expenses of $66,812. This court finds that $328,188 of the "closing costs" were in fact interest, exacted as such and denoted as income on the books of the defendant association, as reflected in the testimony. The defendant has argued that §665.401, F.S., allows it to make this charge. That statute became effective four months after the loan here at issue was made. This statute does not apply. Even if it did, the statute states —

> "In lieu of such initial charges to cover such expenses and costs an association may make a reasonable charge, all or part of which may be retained by the association which renders such service or part or all of it may be paid to others who render such service . . ."

Charging a borrower $390,000 to cover actual out-of-pocket expenses of $66,812 is not a "reasonable charge" within the meaning of that statute.

After closing, but before the defendant began charging interest on the undisbursed portion of the loan, plaintiff's attorney, Marshall Harris, wrote the defendant, pointing out the inequity of the situation and the fact that interest on the loan would exceed 22%. He requested a modification of the loan so that the interest would not run on the undisbursed portion (plaintiff's exhibit no. 14). It is possible to purge a usurious loan of its taint, Carter v. Leon Loan & Finance Co., Fla 146 So. 664. Defendant, clearly on notice, chose to ignore the offer and instead obtained opinion of

additional counsel that it may have been exempt from Florida's usury laws. However, additional counsel refused to take a definitive position on the point (plaintiff's exhibit no. 15). It is obvious that the defendant showed concern with reference to the usury laws as applied to this loan.

The effective rate of interest on the eighteen month construction loan was in excess of 15%. Both plaintiff's and defendant's accountants have testified to this. Defendant exacted interest on an eighteen month loan of $652,169.24. It did so with the requisite intent to take more than the legal rate for the use of the money loaned.

Defendant contends that this court should look to the substance rather than the form of the transaction. It asks the court to spread the "closing costs" over the life of not only the construction loan but also the permanent mortgages. Courts will not remake a contract for parties, All Dixie Ins. Agency v. Moffat, Fla. 212 So.2d 347, Florida East Coast R. Co. v. Atlantic Coastline R. Co., Fla. App. 193 So.2d 660. In substance, this loan was an eighteen month construction loan. On September 1st, 1970, the defendant had the right to demand payment in full of principal and interest (plaintiff's exhibit no. 8). The defendant credited all of the "closing costs" to interest on this eighteen month construction loan. The closing statement reflected the charges as charges on this loan (plaintiff's exhibit no. 9). Although it eventually placed some, but not all, of the permanent mortgages, these were clearly separate loans, interest upon which varied and was not set until construction was almost completed. Thus they were separate and distinct loans. Usury depends upon the scope of rights which the lender possesses, Home Credit Company v. Brown, Fla. 148 So.2d 257. The "closing costs" were included in the money lent. Defendant had the right to be repaid this money in eighteen months. They are clearly, by agreement of the parties, charges for the construction loan alone.

Defendant has raised the statute of limitations by affirmative defense. It had the burden to prove its defense. It did not carry its burden. It offered no proof.

A usury suit is governed by a two year statute of limitations in Florida. In Vance v. Florida Reduction Corp., Fla. App. 263 So.2d 585, the court held —

"Application of the statute as construed by the court in the *Wink* case thus gives the borrower a usurious interest as cause of action for the imposition of a penalty with declara-

tion of forfeiture upon the occurrence of a payment and it is from the date of such payment the statute of limitations provided in §95.116, F.S., begins to run."

The plaintiff testified that the last payment of interest on this construction loan was made by check dated September 28th, 1970 (plaintiff's exhibit no. 18). Defendant's interrogatories admit the payment was received on September 30th, 1970, and credited to interest on the construction loan (plaintiff's exhibit no. 20). Suit was commenced September 25th, 1972, prior to the time the statute ran.

Finally, defendant claims complete exemption from Florida's Usury Act by §665.395, F.S. This loan was made in February of 1969. At that time, the exemption was limited to state chartered savings and loan associations, Sosa v. Petteway, Fla. 64 So. 433, Spinney v. Winter Park Building & Loan Association, Fla. 162 So. 897. The Usury Act itself provided in §687.031, Florida Statutes 1967 —

"Sections 687.02 and 687.03 shall not be construed to repeal, modify or limit any or either of the special provisions of existing statutory law creating exceptions to the general law governing interest and usury . . . including . . . those exceptions which relate to . . . *domestic* building and loan associations . . ."

Domestic building and loan associations were those possessing a state charter, §665.01, Florida Statutes 1967.

In June of 1969, the Savings and Loan Act was completely revised by the legislature. However, §665.53 provided —

"This chapter shall not impair or affect any act done, offense committed or right accruing, accrued, or acquired, or liability, penalty, forfeiture or punishment incurred prior to June 2, 1969, but the same may be enjoyed, asserted, enforced, prosecuted or inflicted, as fully and to the same extent as if this chapter had not been passed."

Neither the old Act nor the new, exempts the defendant from the Usury Acts. See First Federal Savings & Loan Association v. Norwood Realty Co., Ga. 93 S.E.2d 793.

Upon the above findings of fact and conclusions of law, it is ordered and adjudged that the plaintiff, Burleigh House, Inc., have and recover a judgment against the defendant, Financial Federal Savings and Loan Association in the amount of $652,169.24 plus costs as shall hereinafter be taxed, for which sums let execution issue.